# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
### No. 10-739V
Filed: March 20, 2014

| | | |
|---|---|---|
| * * * * * * * * * * * * * * * | | UNPUBLISHED |
| LORETTA FLOYD, | * | |
| | * | Special Master Dorsey |
| Petitioner, | * | |
| | * | |
| v. | * | Dismissal Decision; Failure to |
| | * | Produce Expert Reports; Order to |
| SECRETARY OF HEALTH | * | Show Cause; Measles-Mumps- |
| AND HUMAN SERVICES, | * | Rubella (MMR) Vaccine; |
| | * | Neurologic, rheumatologic, and |
| Respondent. | * | gastrointestinal injuries. |
| * * * * * * * * * * * * * * * | | |

Richard Gage, Richard Gage, P.C., Cheyenne, WY, counsel for petitioner.
Alexis B. Babcock, United States Dept. of Justice, Washington, D.C., counsel for respondent.

## DECISION[1]

On October 29, 2010, Ms. Floyd (petitioner) filed a petition, *pro se*, pursuant to the National Vaccine Injury Compensation Program.[2]  Ms. Floyd alleged that she suffered from neurologic, rheumatologic, and gastrointestinal injuries as a result of a measles, mumps, rubella ("MMR") vaccination she received on October 10, 2007.  Petition ("Pet.") at Preamble.  The information in the record does not show entitlement to an award under the Act.  For the reasons that follow, this case is dismissed for insufficient proof.

---

[1] Because this unpublished decision contains a reasoned explanation for the action in this case, the undersigned intends to post this decision on the United States Court of Federal Claims' website, in accordance with the E-Government Act of 2002, Pub. L. No. 107-347, § 205, 116 Stat. 2899, 2913 (codified as amended at 44 U.S.C. § 3501 note (2006)).  In accordance with Vaccine Rule 18(b), a party has 14 days to identify and move to redact medical or other information, that satisfies the criteria in § 300aa-12(d)(4)(B).  Further, consistent with the rule requirement, a motion for redaction must include a proposed redacted decision.  If, upon review, the undersigned agrees that the identified material fits within the requirements of that provision, such material will be redacted from public access.

[2] The National Vaccine Injury Compensation Program is set forth in Part 2 of the National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755, codified as amended, 42 U.S.C. §§ 300aa-1 to -34 (2006) (Vaccine Act or the Act).  All citations in this decision to individual sections of the Vaccine Act are to 42 U.S.C. § 300aa.

## I.       Factual Background

A detailed summary of the facts of this case is set forth in Respondent's Rule 4 report which was filed on August 10, 2011.  A brief recitation of the relevant facts, as provided in the medical records, is set forth below.

Ms. Floyd was born on July 4, 1962.  Petitioner's Exhibit ("Pet. Ex.") 12A at 2.  Her medical history included a diagnosis of Graves' disease and treatment for shoulder pain and carpal tunnel syndrome.  Id. at 3; Pet. Ex. 12C at 15-17.  Ms. Floyd also reported a history of sarcoidosis and lupus.  Pet. Ex. 12B at 1.

On September 6, 2007, and on October 10, 2007, Ms. Floyd received an measles-mumps-rubella (MMR) vaccine prior to attending graduate school at Washington State University ("WSU").  Pet. Ex. 12A at 5-6.  The first set of medical records that were filed after the October 10, 2007 vaccination are dated May 7, 2008, nearly seven months later.  At this visit, Ms. Floyd was evaluated at WSU Health and Wellness where she reported complaints of a "scratchy throat, trouble breathing and inability to sleep in her apartment" due to a mite infestation.  Pet. Ex. 12B at 10.  Ms. Floyd was advised to talk to her apartment owner about fumigating her apartment or to call the county if she needed suggestions on how to best fumigate.  Id.

The next contemporaneously dated medical records are dated July 10, 2008, where Ms. Floyd returned to WSU for a follow up on her thyroid as well as for problems with insomnia, pressure behind her eyes and a headache.  Pet. Ex. 12B at 9.  Dr. Martha Hunt noted that Ms. Floyd had "a slight prominence of her eyes" and a "slightly enlarged thyroid", but no nodules or point tenderness was noted over her sinuses.  Id.  The assessment included hyperthyroidism which was being treated with Propothyrouracil.  Id.  Ms. Floyd was also diagnosed with insomnia.  Id.

In July 2008, Ms. Floyd returned to WSU several times for treatment of her allergies and for a follow up of her hyperthyroidism.  Pet. Ex. 12B at 7.  On September 8, 2008, Ms. Floyd presented to Dr. Linda Fearn, an internal medicine specialist, and expressed concerns about her insomnia, allergy problems and sensitivity to sunlight.  Pet. Ex. 12B at 1-3.  Ms. Floyd also expressed her concern that she may have lupus and requested diagnostic testing.  Id.  Upon examination, Ms. Floyd was noted to have mild proptosis[3], a mildly injected conjunctiva, and a significantly enlarged thyroid.  Id.  Dr. Fearn suspected that Ms. Floyd had Graves' Disease.  Id.

On September 16, 2008, Ms. Floyd was evaluated by Dr. Steven Cox at WSU who felt that Ms. Floyd had numerous "somatic concerns" that did not "jive well with her clinical findings or laboratory findings."  Pet. Ex. 12A at 15.  Dr. Cox diagnosed Ms. Floyd with hyperthyroidism and a somatization disorder and recommended that she undergo a psychiatric evaluation.  Id.

Three days later, on September 19, 2008, Ms. Floyd returned to see Dr. Fearn and

---

[3] Proptosis is defined as "exophthalmos" or an "abnormal protrusion of the eyeball."  Dorland's Illustrated Medical Dictionary, 32nd Edition ("Dorland's") at 660, 1528.

reported numerous complaints including photosensitivity, sores on her mouth, and shortness of breath when walking.  Pet. Ex. 12A at 12-14.  On examination, Dr. Fearn noted that Ms. Floyd was "a healthy appearing woman who is wearing four pairs of glasses… Exam today is limited to her neck, which is without masses, although I did not exam her thyroid today."  Id. at 13.  Dr. Fearn's assessment included hyperthyroidism, suspected Graves' disease, and a probable somatization disorder.  Id.  Ms. Floyd declined a psychiatric referral.  Id.

On October 29, 2008, Ms. Floyd saw Dr. John Baldwin, a rheumatologist, for her ongoing symptoms of sleep difficulties, fatigue, and photosensitivity.  Pet. Ex. 14 at 4.  Ms. Floyd also reported her concern that she may have lupus because she had been reading about lupus on the internet and was convinced that she had the disease, supported by the fact that her grandmother had lupus.  Id.  Dr. Baldwin did not recommend any treatment or disability accommodations and felt that Ms. Floyd's primary care physicians could adequately manage her photosensitivity problems.  Id. at 5.

From December 2008 through April 2009, Ms. Floyd continued to see her physicians and also had an evaluation from a neurologist, all attempting to diagnose and treat Ms. Floyd's various symptoms.  Pet. Exs. 15, 16A.  In February 2009, Dr. Morgan observed that all of the results of Ms. Floyd's laboratory testing were normal with the exception of an increased T2 signal on her MRI.  Pet. Ex. 15 at 14.  Dr. Morgan recommended an echocardiogram and a sleep deprived EEG due to Ms. Floyd's statement that she had a previous history of febrile seizures.  Id. at 14-15.

On April 8, 2009, Ms. Floyd saw Dr. Richard Emtman at Pullman Family Medicine for multiple problems.  Pet. Ex. 16A at 16-18.  Dr. Emtman confirmed that Ms. Floyd's thyroid tests came back normal and that she was not anemic and had no findings of hyperchromic indices.  Id.  Dr. Emtman also reviewed Dr. Morgan's findings that Ms. Floyd's rheumatoid test was negative.  Id.  During this visit, Ms. Floyd requested that Dr. Emtman sign a letter that Ms. Floyd drafted requesting that Ms. Floyd receive accommodations from WSC, which Dr. Emtman refused to sign.  Pet. Exh. 16A at 16-18.

Ms. Floyd returned to Dr. Morgan on April 14, 2009.  Pet. Ex. 15 at 25-26.  Aside from migraines, Dr. Morgan did not feel that Ms. Floyd had any underlying neurological conditions.  Id. at 26.  Dr. Morgan stated that she could not state whether Ms. Floyd had any underlying psychiatric conditions, because she was not qualified to make such a diagnosis, but observed that Ms. Floyd had a lot of anxiety, which resulted in her reading "a lot of things on the internet that cause her to feel that she has many other conditions that she probably does not have."  Id.

On April 28, 2009, Ms. Floyd returned to see Dr. Emtman.  Pet. Ex. 16A at 21, 24-25.  Following an examination, Dr. Emtman noted that he would encourage Ms. Floyd to seek out a Behavioral Health Specialist or "she will continue to seek out health care providers which will help legitimize her numerous concerns."  Id.

On July 13, 2009, Ms. Floyd was evaluated by Dr. Robert Baughman, a sarcoidosis specialist.  Pet. Ex. 20 at 1-4.  Ms. Floyd informed Dr. Baughman that her "current set of problems" began in September 2007, shortly after her first set of MMR vaccinations.  Id.  Dr.

3

Baughman also noted that Ms. Floyd diagnosed herself with lupus, although her lupus screening test results were negative.  Id.  Ms. Floyd also gave a history of food intolerance and diabetes. Dr. Baughman stated in his report that his examination of Ms. Floyd was essentially unremarkable and that Ms. Floyd probably did not have sarcoidosis, although he did note that it was a diagnosis of exclusion.  Id.  Dr. Baughman ordered a number of additional tests for Ms. Floyd, but told her that at this time, she did not have any specific features that confirmed or denied the diagnosis of sarcoidosis.  Id.

On August 21, 2009, Ms. Floyd underwent a dermatologic consultation with Dr. Robert Palacio.  Pet. Exh. 22 at 1-9.  On the intake questionnaire, Ms. Floyd checked approximately 90% of the items in a screening "list of current problems," including fever, sweats, unintentional weight loss, keloid, loss of balance, headaches, seizures, paralysis, shortness of breath, wheezing, atrial fibrillation, edema, and chest pain.  Id. at 8.

On August 27, 2009, Ms. Floyd was evaluated by an ophthalmologist, Dr. Ronald Warwar, who detailed numerous tests relating to Ms. Floyd's possible diagnosis of sarcoidosis. Pet. Ex. 25 at 1.  A fine needle aspiration of Ms. Floyd's parotid gland was essential non-diagnostic with no atypical cells found.  Id.  Dr. Warwar stated that Ms. Floyd's findings could be consistent with Sjogren's disease.  Id.

In 2009, Ms. Floyd applied for social security disability benefits.  Pet. Ex. 27.  An appointment was scheduled with Dr. Len McCoy, a psychiatrist on September 14, 2009.  Id. There are no other records filed regarding this disability claim.

## II.   Procedural Background

This case was initially assigned to Special Master Moran who ordered petitioner to file medical records by March 3, 2011.  Ms. Floyd filed medical records on March 10, 2011, May 5, 2011, and May 12, 2011.  On August 10, 2011, respondent filed a report pursuant to Vaccine Rule 4(c) stating that petitioner had not demonstrated an entitlement to compensation under the Vaccine Act.  On May 13, 2012, Ms. Floyd filed a detailed, written response to the Rule 4 report. She filed additional attachments to her response on July 30, 2012.

On October 31, 2012, Ms. Floyd filed a motion for enlargement of time to file additional evidence in support of her case.  On November 5, 2012, respondent filed an opposition to petitioner's motion and requested that the special master set firm deadlines for the submission of evidentiary submissions in this case.

On January 3, 2013, Special Master Moran issued an order for Ms. Floyd to file a response to respondent's response and respondent's request that evidentiary deadlines be set in this case. The case was transferred to the undersigned on January 15, 2013.

On February 4, 2013, Ms. Floyd filed a motion for an enlargement of time seeking 60 days to seek an expert witness and/or an attorney.  A status conference was scheduled for May 14, 2013, with Ms. Floyd to discuss her motion and to discuss procedures for moving forward with her case.

On May 14, 2013, a status conference was held where Ms. Floyd stated that she had retained an attorney to represent her. A deadline was set for June 17, 2013, to have her attorney enter an appearance in this case.

On June 16, 2013, Mr. Richard Gage entered an appearance on behalf of petitioner. A status conference was held on July 25, 2013, where the undersigned informed petitioner's counsel that an expert report would be required in order for Ms. Floyd to proceed with her claim. A deadline was set for August 26, 2013, for petitioner to file an expert report.

On August 26, 2013, petitioner filed an expert report prepared by Dr. Vera Byers who opined, after a review of the records filed in this case, that Ms. Floyd has "no identifiable autoimmune disease which could be triggered by a number of agents including vaccinations or infections … As a result, [Dr. Byers] could not come to an opinion to a reasonable degree of probability that any of [Ms. Floyd's] reported signs or symptoms resulted from the MMR vaccinations she received in 2007." Pet. Ex. 103 at 2.

On September 16, 2013, Ms. Floyd, through her counsel, filed a motion to exclude the "testimony", i.e., the report of Dr. Byers. In support of her motion, Ms. Floyd took issue with the fact that Dr. Byers referred to her as a "lady," that Dr. Byers relied on records of only three of Ms. Floyd's physicians for the basis of her expert opinion, that Dr. Byers erroneously relied on statements from Dr. Emtman, and that Dr. Byers "refused to acknowledge any doctor reports of conditions known to be associated with lupus, particularly with African-Americans." Ms. Floyd also requested 90 days to have her case reviewed by the Washington Bureau of the NAACP. On September 20, 2013, respondent filed a response to the motion, opposing both of petitioner's requests and renewing respondent's request that the case be dismissed. On October 28, 2013, the undersigned denied petitioner's motion to exclude Dr. Byers' expert report.

The undersigned issued an Order to Show Cause on November 5, 2013, ordering Ms. Floyd to file an expert report or other competent proof in support of her claim. On February 3, 2014, Ms. Floyd filed a letter addressed to the NAACP requesting the NAACP's legal assistance to "protect her rights under the Civil Rights, Vaccine Injury Compensation & Disability Acts." Pet. Ex. 105 at 1. Ms. Floyd's letter reiterated many of the arguments set forth in her September 16, 2013 motion to exclude the testimony of Dr. Byers. The letter did not include an expert opinion in support of her claim as ordered in the November 5, 2013 Show Cause Order. On February 6, 2014, Ms. Floyd's attorney, Richard Gage, filed a motion to withdraw from the case stating that Ms. Floyd was seeking other counsel to represent her in this case. To date, Ms. Floyd has failed to file an expert report or other competent proof in support of her claim as ordered on November 5, 2013.

## III. Requirement for an Expert Report or Supportive Medical Records

Petitioner bears the burden of proving a prima facie case by a preponderance of the evidence. See 42 U.S.C. § 300aa-13(a)(1)(A); see also Moberly v. Sec'y of Health & Human Services, 592 F.3d 1315, 1320 (Fed. Cir. 2010). To prove causation, petitioner must "show by preponderant evidence that the vaccination brought about [the] injury by providing: (1) a medical

theory causally connecting the vaccination and injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of proximate temporal relationship between vaccination and injury." <u>Moberly</u>, 592 F.3d at 1322 (citing <u>Althen v. Sec'y of Health & Human Servs</u>., 418 F.3d 1274, 1278 (Fed. Cir. 2005).

The preponderance standard applies to each element of petitioner's proof.  For example, with regard to the medical theory, the theory must be "persuasive" – that is, specific to petitioner's case and supported by a "reputable", i.e., reliable, scientific or medical explanation. <u>Moberly</u>, 592 F.3d at 1322 (holding that "[a] petitioner must provide a reputable medical or scientific explanation that pertains specifically to petitioner's case"); <u>Althen</u>, 418 F.3d at 1278 (holding that "[a] persuasive medical theory is demonstrated by 'proof of a logical sequence of cause and effect showing that vaccination was the reason for the injury[,]' the logical sequence being supported by 'reputable medical or scientific explanation[,]' . . ."(citing <u>Grant v. Sec'y of Health & Human Servs.</u>, 956 F.2d 1133, at 1148 (Fed. Cir. 1992).

A petitioner may not be awarded entitlement under the Vaccine Act based a petitioner's claims alone.  Rather, the petition must be supported by either medical records or by the opinion of a competent physician.  <u>See</u> 42 § 300aa-13(a)(1).  In this case, because the medical records do not support petitioner's claim, a medical opinion must be offered in support.

Petitioner has not offered a supportive expert report in support of her claim.  To the contrary, the opinion by the expert offered by petitioner states that the expert could not come to an opinion to a reasonable degree of probability that any of Ms. Floyd's reported signs or symptoms resulted from the MMR vaccinations she received in 2007.  In addition, none of Ms. Floyd's treating physicians attribute any of her conditions to her MMR vaccination.  There is also no evidence in the record of appropriate temporal relationship between Ms. Floyd's vaccination(s) and the onset of her injuries.

## IV.    Conclusion

Therefore, Ms. Floyd's petition is hereby DENIED.  Thus, this case is dismissed for insufficient proof.  In the absence of a motion for review, the Clerk is directed to enter judgment accordingly.

**IT IS SO ORDERED.**

<u>Nora Beth Dorsey</u>
Nora Beth Dorsey
Special Master